Filing # 108113547 E-Filed 05/29/2020 11:02:32 AM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:
DIVISION:

**MELONIE D. LONG,**

      Plaintiff,

v.

**ALLERGAN SALES, LLC,**
**a foreign limited liability company**, and
**RICARDO E. MOJICA,**

      Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

The Plaintiff, **MELONIE D. LONG**, sues the Defendants, **ALLERGAN SALES, LLC,**

**a foreign limited liability company**, and **RICARDO E. MOJICA**, and alleges the following:

### GENERAL ALLEGATIONS

1.    This is an action for damages in excess of $30,000, exclusive of attorney's fees,

costs, and interest.

2.    All conditions precedent to the filing of this action have been performed or have

occurred.

3.    At all times material, the Plaintiff, **MELONIE D. LONG** (hereinafter "Ms.

Long"), was a resident of Glen St. Mary, Baker County, Florida.  Ms. Long is presently a

resident of, and permanently domiciled in, Jacksonville, Duval County, Florida.

4.    All medical care and treatment rendered to Ms. Long upon which the claims set

forth herein are based took place in Jacksonville, Duval County, Florida.

5.    The Defendant, **ALLERGAN SALES, LLC** (hereinafter "Allergan"), is a foreign

limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

6.     Allergan is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:   researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

7.     Allergan may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

8.     At all times material hereto, the Defendant, **RICARDO E. MOJICA** (hereinafter "Mojica") was and is a resident of, and permanently domiciled in, the State of Florida, to-wit, at 2425 Northwest 26th Street, Boca Raton, Palm Beach County, Florida.

9.     Allergan and Mojica's co-conspirators, whom Allergan and Mojica aided and abetted, were:  (i).  Loren Z. Clayman, M.D. (hereinafter "Clayman Senior"); (ii).  his son, Mark A. Clayman, M.D. (hereinafter "Clayman Junior"); (iii).  and their medical professional association, Loren Z. Clayman, M.D., P.A. (hereinafter the "Clayman Practice"). Hereinafter, Allergan and Mojica's co-conspirators will be collectively referred to as the "Claymans."

**FACTUAL ALLEGATIONS**

10.     For at least 15 years, Allergan has known that Clayman Senior, Clayman Junior, and the Clayman Practice were lying to hundreds of female patients by telling them they had ruptured, deflated, or leaking saline breast implants so the Clayman Practice could collect free implants and surgical fees for replacement surgeries.  Allergan knew the Claymans were lying because:  (1). Allergan's own Southeast Regional Sales Director, Mojica, individually and

2

through the sales representatives working under him, first proposed to, and repeatedly encouraged, his Florida plastic and cosmetic surgery customers (including the Claymans) to lie to their patients and on breast implant warranty claim forms about the condition of saline implants in order to obtain free breast implants and surgical fees; (2) As Allergan received a breast implant warranty claim form signed by the patient and Clayman Senior or Junior for each warranty claim made by the Clayman Practice, Allergan was aware that the Clayman Practice was lying to its patients about the condition of their breast implants;  (3).  for each warranty claim made by the Clayman Practice, Allergan examined the implants at issue and found that they were not defective; and (4). the Clayman Practice's saline breast implant failure rate was markedly higher than the failure rate of 1.5% for each year after surgery that Allergan's own studies of its saline breast implants showed.

Despite this knowledge, Allergan paid every saline breast implant warranty claim made by the Clayman Practice—5,278 claims—between January 1, 2006 and December 31, 2015. Allergan paid these claims because the Clayman Practice purchased large quantities of breast implants, other medical devices, and pharmaceuticals from Allergan, and Allergan wanted to encourage and promote the Clayman Practice's continued purchase of their products.  As demonstrated by the multiple criminal and civil proceedings against Allergan within the past 10 years, it is apparently an integral part of Allergan's marketing plan to pay (bribe) physicians to use its products.  For these reasons, Allergan and Mojica are liable to Ms. Long for aiding and abetting and conspiring with Clayman Senior, Clayman Junior, and/or the Clayman Practice.

### Allergan and McGhan/Inamed

11.     Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants.  In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

12.    In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed.  The new company's breast implants were still labeled McGhan breast implants.  By this time, the company was one of the largest breast implant manufacturers in the world.

13.    In March 2006, Inamed merged with Allergan, a multinational manufacturer of healthcare products in many different categories, including the following:  dermatology, central nervous system, eye care, women's health and urology, gastroenterology, cardiovascular diseases, infectious diseases, and aesthetics.  Among Allergan's products are Botox (therapeutic and aesthetic), Namenda, Restasis, Linzess, Bystolic, Juvederm, Latisse, Loestrin, Estrace Cream, Teflaro, Dalvance, Ozurdex, Optive, Viibryd, Liletta, and Saphris.  After the merger with Inamed, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

**Allergan's Breast Implant Warranty Scheme**

14.    After the merger, Allergan created Allergan Partnership Privileges (hereinafter "APP").[1]  APP provided members with rebates, sales growth rewards, a special online physician locator listing, priority customer service line access, preferred shipment status, and certificates and status displays; the purposes of APP was to leverage sales across its entire line of aesthetic products.  To become an APP Partner, a medical practice had to purchase at least three types of aesthetic products:  Botox (one of the company's most profitable products), a dermal filler (i.e., Juvederm), and breast implants.  APP had several tiers based upon the volume of Allergan aesthetic product purchases:  Bronze, Silver, Gold, Platinum, and Diamond; Diamond tier partners received the highest level of perks from Allergan.[2]

---

[1]    As of January 31, 2020, Allergan discontinued the APP.
[2]    Allergan later added another tier to the top level, Double Diamond.

15.     Despite implementing the APP, in most regions Allergan's breast implants sales lagged behind those of its chief competitor, Mentor, which offered breast implants at lower prices.

16.     To increase the volume of breast implants sales, Allergan encouraged and approved regional sales directors in certain regions[3] to direct their sales representatives to expressly offer Diamond tier APP partners incentives that, crossing legal and ethical boundaries, *amounted to kickbacks and bribes*.  In some instances, they offered Diamond APP partners free travel and lavish non-educational parties in exchange for greater breast implant purchases.  In other instances, in exchange for increased breast implant purchases, representatives provided Diamond tier surgeons free implants and surgical fees by allowing them to make false breast implant warranty claims.

17.     In the false warranty scheme, in exchange for higher breast implant purchases, Allergan's sales and marketing representatives (including Mojica and those working for him) expressly directed Diamond tier surgery practices (including the Claymans) to falsely claim implants had spontaneously ruptured, deflated, or leaked so they could receive free breast implants and surgical fees under the warranty.  One effect of this scheme was that it facilitated "cover ups" by certain surgeons who falsely attributed poor breast surgery outcomes to ruptured, deflated, or leaking implants rather than careless surgical practices.    As such, these surgeons were able to make more money from poor surgical practices, as Allergan increased its percentage of the breast implant market despite Mentor's lower prices.

---

[3]     Among the known regions where the warranty scheme was encouraged were Southern California, Colorado, and Florida.

**The Clayman Practice**

18.     Clayman Senior was first licensed as a medical doctor in Florida on January 10, 1975.   On December 31, 1976, he completed a residency in plastic surgery, and he began practicing in Jacksonville, Florida.   Soon after establishing the Clayman Practice, he began performing breast augmentation surgeries.   During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

19.     After the FDA prohibited the widespread use of silicone breast implants in 1992, Clayman Senior began using saline filled implants exclusively.

20.     As of the early 2000s, the Clayman Practice began marketing its breast augmentation practice to patients of modest means.   To reach this population, the Clayman Practice advertised extensively in free local discount publications.   Furthermore, the Clayman Practice began charging less for breast augmentations than other local plastic surgeon; while most plastic surgeons charged between $5,000 and $10,000, the Clayman Practice charged only $3,750.   As a result, the Clayman practice became a high-volume breast augmentation plastic surgery practice.

**Ricardo E. Mojica**

21.     Between 2000 and 2006, Mojica worked as a surgical sales representative for Inamed/McGhan.   The products he sold were breast implants, facial implants, and injectable "fillers."

22.     In 2002, Mojica was promoted to the Southeast Team Field Trainer.

23.     In 2003, Mojica was named "sales representative of the year" by Inamed/McGhan for achieving $1,040,000 in sales, which was an increase of 37% from the previous year.

24.     After the merger with Allergan, Mojica was promoted to Southeast Regional Sales Director, for which his territories included Florida, Georgia, and South Carolina.   Mojica

held this position between 2006 and 2013. According to his personal LinkedIn profile, he was "responsible for leading and developing an elite 10-member sales team," of which he claimed the "foundation of our success was achieved through a collaborative and synergistic team culture." He also attributes his success as the Southeast Regional Sales Director to "helping team members achieve their individual goals and open collaboration channels to share effective practices."

25.    In reality, Mojica trained and directed his sales representatives to act in ways that previous managers had prohibited. Specifically, he trained and directed them to expressly offer Diamond tier APP partners non-educational parties and travel in exchange for increased implant purchases. He also trained and directed them to employ the breast implant warranty scheme (see paragraphs 14-17). Specifically, sales representatives were trained and directed to expressly offer Diamond tier partners free breast implants and surgical fees for false warranty claims in exchange for higher breast implant and other aesthetic product purchases.

26.    Soon after adopting these unethical and illegal sales practices, Allergan's breast implant sales volumes increased rapidly in Mojica's region, particularly in Florida, even though Mentor continued to offer lower prices on implants. As the volume of breast implant sales increased, the profit per pair of implants diminished, and the number of returned implants increased.

27.    In 2013, Mojica was promoted to Junior Director, Medical Education. In his new position with Allergan, Mojica was responsible for "building and leading a high-performing team responsible for development of the plastic surgery sales force and plastic surgeons." In this capacity, Mojica began training and directing sales representatives across the country to, among other things, employ the breast implant warranty scheme with Diamond tier partners.

**The Allergan/Mojica-Clayman Conspiracy**

28.     Until the mid-2000s, the Clayman Practice purchased saline breast implants from Allergan's predecessor (Inamed/McGhan) *and Mentor*.  During this time, Clayman Senior began "covering up" his poor surgical practices by blaming post-augmentation complications on leaking, ruptured, or deflated implants.  Clayman Senior lied to his patients because he knew that by claiming that the implants were defective, he could divert blame for the complications away from himself.

29.     During a single year in the mid-2000s, the Clayman Practice made more than 40 warranty claims to Mentor.  In response, Mentor's quality assurance department contacted the regional sales manager and advised him that the high number of claims was indicative of <u>fraud</u>. Mentor asked the regional sales manager to meet with Clayman Senior and demand an explanation for the unusually high number of warranty claims.  Clayman Senior refused to meet with the sales manager.  As a result, Mentor permanently ended its relationship with the Clayman Practice, and Inamed/McGhan became the Clayman Practice's sole breast implant supplier.

30.     After Allergan acquired Inamed/McGhan in 2006, the company adopted the APP and installed Mojica as the Sales Director for the Southeast Region, which included Jacksonville, Florida.  Soon afterward, the Clayman Practice became a Diamond tier partner in the APP as a result of its high-volume purchases of Allergan aesthetic products such as Botox, Juvaderm, and Natrelle saline breast implants.

31.     After Mojica was promoted to Southeast Regional Sales Director, he became personally acquainted with Clayman Senior, his wife Elana Clayman, and Clayman Junior (who was still in his post-medical school training at the time).  Mojica and the Claymans even socialized together at national plastic surgery conferences outside of Jacksonville.  Mojica

expressly offered the Claymans the opportunity to participate in the breast implant warranty scheme.  Mojica also directed his sales representatives to reiterate his offer to participate in the breast implant warranty scheme to the Claymans.  With that, the Claymans had found in Allergan, Mojica, and his sales representatives partners willing to assist them in defrauding their patients.  Thereafter, Allergan and the Claymans developed a symbiotic relationship built upon the mutual knowledge and understanding that the Claymans were lying to patients about the condition of their breast implants to receive free breast implants and surgical fees, in exchange for the Claymans' continued purchases of high volumes of Allergan's aesthetic products such as breast implants.

32.    Between 2006 and 2015 the Clayman Practice made the following warranty claims, for which Allergan made the following payments:

| Year | Warranty Claims | Warranty Payments to the Clayman Practice |
|------|-----------------|-------------------------------------------|
| 2006 | 84 | $  106,800 |
| 2007 | 76 | $  110,400 |
| 2008 | 150 | $  213,600 |
| 2009 | 261 | $  261,000 |
| 2010 | 521 | $  855,600 |
| 2011 | 866 | $1,420,000 |
| 2012 | 849 | $1,380,000 |
| 2013 | 798 | $1,330,000 |
| 2014 | 1,057 | $1,770,000 |
| 2015 | 616 | $1,090,000[4] |

---

[4]    The undersigned does not have records reflecting the number of breast implant warranty claims the Clayman Practice made to Allergan after 2015.

33. To make a breast implant warranty claim, surgery practices were required to return "defective implants" to Allergan, where members of the product surveillance department performed what they called *Laboratory Analyses*, a series of tests designed to identify root causes of ruptures, deflations and leaks. The product surveillance department would then generate *Laboratory Analysis* reports detailing their findings. [5]

34. Nearly every *Laboratory Analysis* report for saline breast implants returned by the Clayman Practice found no evidence of a "loss of shell integrity, resulting in implant rupture or deflation," which was a requirement for payment under Allergan's warranty. Nevertheless, Allergan paid every warranty claim from the Clayman Practice between 2006 and 2015; this amounted to **5,278 warranty claims for a total of $8,537,400 in payments**.

35. Allergan's own studies of its saline breast implants showed a failure rate that was markedly lower than the failure rate experienced by the Clayman Practice. According to this study, the failure rate for Allergan Natrelle saline breast implants was only 1.5% for each year after surgery.

36. Allergan has had a deep financial motivation for paying the Clayman Practice's 5,278 warranty claims. Between January 1, 2008 and December 31, 2015, the Clayman Practice purchased 11,082 pairs of saline breast implants from Allergan, which made the Clayman Practice one of Allergan's top 10 breast implant customers in Florida. Furthermore, the Clayman Practice purchased a host of other aesthetic products from Allergan, including the following: Botox, Latisse, Juvederm, Kybella, SkinMedica, Vivate, and CoolSculpting (a product marketed by Zeltiq Aesthetics, which is a subsidiary of Allergan). Since Allergan adopted the APP, the

---

[5]    One important reason the Allergan-Clayman conspiracy went undiscovered for so many years was that Allergan did not as a matter of course provide patients with copies of their *Laboratory Analysis* reports.

Clayman Practice has essentially become a "one supplier shop." When a nurse employed by the Clayman Practice asked Clayman Senior why he believed Allergan would keep paying his breast implant warranty claims, he told her, "I know they're going to pay them all because I'm a Diamond level partner."

37.    During this same time period, other plastic surgery practices that were not APP Diamond tier partners had their saline breast implant warranty claims denied by Allergan, even though they made fewer than 5 warranty claims per year.

38.    Furthermore, to the best of the undersigned's information and belief, Allergan has devised an "off-balance-sheet" method of paying breast implant warranty claims. Specifically, Allergan pays breast implant warranty claims through a captive insurance company created and owned by Allergan.[6] When a manufacturer such as Allergan creates a captive insurance company, the manufacturer is provided a means of reclassifying otherwise taxable income from across its various divisions and subsidiaries as "premium payments" that go to the captive insurance company. The formerly taxable income that is reclassified as "premiums" then accumulates within the captive, making it, essentially, a large "slush fund." In the event the manufacturer uses the captive insurance company to pay a "loss," such as a breast implant warranty payment, the loss is not reflected in the manufacturer's balance sheets or filings with the Securities and Exchange Commission. In addition, because the captive is not a third-party company, manufacturers with captive insurance companies are free to manipulate the claims process without outside interference.

39.    In earlier related lawsuits filed against Allergan, Clayman Senior, Clayman Junior, and Elana Clayman were each served a subpoena for a video deposition, which took

---

[6]    *See*, https://opencorporates.com/companies/us_hi/206243D1.

place on December 4, 2018. In each of these depositions, when asked about their possible involvement in the Allergan breast implant warranty scheme, the Claymans refused to answer and invoked their Fifth Amendment rights against criminal self-incrimination.

### Allergan's Similar Course of Conduct Across Other Divisions

40.     The breast implant warranty scheme is not the first instance in which Allergan has been implicated in a physician bribery scheme, as Allergan has been implicated in violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), at least six times, resulting in Allergan paying a total of $1.089 billion in criminal penalties and civil settlements.

41.     The federal Anti-Kickback Statute prohibits anyone from

knowingly and willfully offer[ing] or pay[ing] remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

…

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[7]…

42 U.S.C. §1320a-7b(b)(2).

42.     Over the past ten years, Allergan was involved in the following:

A.     **September 1, 2010**, Allergan was forced to pay $600 million in settlement of criminal and civil complaints that included allegations of providing free physician workshops and dinners, paying physicians to attend "advisory boards" promoting off-

---

[7]     Because the Clayman Practice's patients paid for their breast augmentation procedures with cash (not under a Federal health care program), the Anti-Kickback Statute does not apply to the Clayman scheme, and Plaintiffs assert no claim under the Anti-Kickback Statute. Plaintiffs, however, allege the facts concerning Allergan's conduct in violation of the Anti-Kickback Statute to show this Court that it is plausible that Allergan, consistent with its past criminal conduct, engaged here in criminal conduct by conspiring with, and substantially assisting, the Clayman Practice to perpetrate fraud upon its patients.

label uses, and created Alphamedica, which administered a speakers bureau that paid physicians $1,000 to allow sales representatives to shadow them at work.[8]

B.    **September 15, 2010**, Allergan's Forest Laboratories division was forced to pay a $313 million settlement of criminal and civil complaints that included allegations of cash payments to physicians that the company described as "grants" and "consulting fees," expensive meals, and lavish entertainment to physicians to induce them to prescribe the drugs Celexa and Lexapro.[9]

C.    **October 29, 2015**, Allergan's Warner Chilcott division was forced to pay a $125 million settlement in a case that included allegations of violations of paying doctors speaLe fees to induce them to prescribe the drugs Asacol, Actonel, and Loestrin.[10]

D.    **December 15, 2016**, Allergan's Forest Laboratories division was forced to pay a $38 million settlement in a case that included allegations of paying kickbacks to physicians to induce them to prescribe the drugs Bystolic, Savella, and Namenda.[11]

E.    **June 29, 2017**, Allergan was forced to pay a $13 million settlement in a case involving allegations of providing valuable business consulting services, continuing medical education, and other valuable services to physicians to induce them to prescribe

---

[8]    *See*,    https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-resolve-allegations-label-promotion-botox;    https://www.cbsnews.com/news/how-allergan-sponsored-a-history-of-sausages-to-promote-botox-illegally/.

[9]    *See*,    https://www.justice.gov/opa/pr/drug-maker-forest-pleads-guilty-pay-more-313-million-resolve-criminal-charges-and-false.

[10]    *See*, https://www.wsj.com/articles/allergan-unit-to-plead-guilty-to-fraud-pay-125-million-1446139657/?mod=mktw.

[11]    *See*,    https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations.

Allergan eye care products including Restasis, when other less expensive treatment alternatives were available.[12]

43.    Allergan's previous conduct demonstrates that its involvement in the breast implant warranty scheme was and is part of a larger course of conduct whereby the company's marketing plan includes bribing physicians to increase sales.

### Melonie D. Long

44.    Ms. Long first sought a consultation for a breast augmentation with Clayman Senior on May 22, 2012, at which time she reported that she was unhappy with her breasts because they were "small & uneven after breast feeding 4 kids." After a brief physical examination, Clayman Senior recommended an augmentation with saline implants for $3,750.

45.    On April 12, 2013, Ms. Long presented to the Clayman Practice for the recommended surgery. Clayman Senior documented in the OR Record that he implanted Allergan Natrelle Style 68 High Profile 400cc saline implants. Clayman Senior failed to document the amount of saline he used to inflate the implants.

46.    On July 15, 2013, Ms. Long returned to the Clayman Practice, where she was seen by Clayman Senior. On that dated she reported that her left breast was smaller than her right breast, and that she wanted her breasts to be "bigger." After performing a brief physical examination, Clayman Senior told her that she had a left deflation and that she needed surgery to remove and replace both implants. On that same date, Clayman Senior and/or Clayman Practice staff gave Ms. Long a written surgical estimate that stated "Left smaller," and that she needed a "Bilateral Replacement," and that the surgery would be at no charge to her because "Co. will supply."

---

[12]    *See,* http://www.pietragallo.com/library/files/nevyas_allergan_press_release_final.pdf.

47.     On July 31, 2013, Ms. Long presented to the Clayman Practice for her second breast surgery with Clayman Senior.  Upon arriving, Clayman Senior and/or Clayman Practice staff had her sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she was undergoing a "Bilateral Replacement Augmentation."  A preoperative photograph taken of her breasts that date demonstrates that she did not have a rupture, deflation, or leak at either of her breasts.

48.     In the Operative Report and OR Record (both of which were dated July 31, 2013), Clayman Senior documented that her preoperative diagnosis was "Left deflation."  Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the left, the implant was "found to have deflation (tissue/leak @ valve) and removed."  The right implant was found intact, but it was also removed.  Both implants were replaced with Allergan Natrelle Style 68 High Profile 425cc saline implants.  Clayman Senior failed to document the amount of saline he used to inflate both implants.

49.     On or between July 31, 2013, and August 7, 2013, Clayman Senior and/or Clayman Practice staff had Ms. Long sign an Allergan breast implant warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her left implant, and that as a result, she was required to undergo surgery to remove and replace both implants.  The Claymans sent the removed implants and the completed warranty claim forms to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory.  After conducting an analysis of the implant, the Device Analysis Laboratory found no basis for the claimed rupture, deflation, or leak.  Specifically, there were "no openings in the implant"; valve functioning was "satisfactory"; and "no source of the alleged deflation was noted…"  Nevertheless, after the removal and replacement surgery, the Clayman Practice received a warranty claim check from Allergan for $1,200 for the removed implants.

50.    On November 13, 2013, Ms. Long returned to the Clayman Practice and reported to Clayman Senior that her breasts were "still not even," and that she had "hard knots under [her] scars."   After performing a brief physical examination, Clayman Senior told Ms. Long that she had a deflation at her left implant, and that she needed surgery to replace it at no charge to her.

51.    On December 2, 2013, Ms. Long presented to the Clayman Practice for her third breast surgery.   In the surgical intake form, Ms. Long wrote that her left breast was "lower & softer than right side."   A preoperative photograph taken of her breasts that date demonstrates that she did not have a rupture, deflation, or leak at either of her breasts.

52.    In the Operative Report and OR Record (both dated December 2, 2013), Clayman Senior documented that her preoperative diagnosis was "Left deflation."   Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the left, the implant was "found to have deflation (tissue/leak @ valve) and removed."   The left implant was replaced with an Allergan Natrelle Style 68 High Profile 465cc saline implant.   Once again, Clayman Senior failed to document the amount of saline he used to inflate the implant.

53.    On or about December 2, 2013, Clayman Senior and/or Clayman Practice staff had Ms. Long sign an Allergan breast implant warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her left implant, and that as a result, she was required to undergo surgery to remove the left implant.   The Claymans sent the removed implant and the completed warranty claim forms to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory.   After conducting an analysis of the implant, the Device Analysis Laboratory found no basis for the claimed rupture, deflation, or leak. Specifically, there were "no openings in the implant" and "[v]alve functioning was satisfactory." Nevertheless, on or about March 3, 2014, the Clayman Practice received a warranty claim check from Allergan for $1,200 for the removed implants.

16

54.     On February 5, 2014, Ms. Long returned to the Clayman Practice and complained to Clayman Senior that her breasts were "uneven" and "different sizes." After performing a brief physical examination, Clayman Senior told her she had a deflation at her left breast implant, and that she needed surgery to replace both implants. That same date, Clayman Senior and/or Clayman Practice staff gave Ms. Long a written surgical estimate that said "Left smaller," that she needed a "Bilateral Replacement," and that "Co. will supply."

55.     On February 10, 2014, Ms. Long presented to the Clayman Practice for her fourth breast surgery with Clayman Senior. In the surgical intake forms, Ms. Long wrote that "one's higher than other," that "one's bigger than other," and that she wanted "both bigger." A preoperative photograph taken of her breasts that date demonstrates that she did not have a rupture, deflation, or leak at either of her breasts.

56.     In the Operative Report and OR Record (both of which were dated February 10, 2014), Clayman Senior documented that her preoperative diagnosis was "Left deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the left, the implant was "found to have deflation (tissue/leak @ valve) and removed." The right implant was found intact, but it was also removed. Both implants were replaced with Allergan Natrelle Style 68 Medium Profile 600cc saline implants. Once again, Clayman Senior failed to document the amount of saline he used to inflate the implants.

57.     On or between February 10, 2014, and February 12, 2014, Clayman Senior and/or Clayman Practice staff had Ms. Long sign an Allergan breast implant warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her left implant, and that as a result, she was required to undergo surgery to remove and replace both implants. The Claymans sent the removed implants and the completed warranty claim forms to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory. After conducting

an analysis of the implant, the Device Analysis Laboratory found no basis for the claimed rupture, deflation, or leak. Nevertheless, on May 1, 2014, the Clayman Practice received a warranty claim check from Allergan for $1,200 for the removed implants.

58.    On April 14, 2014, Ms. Long returned to the Clayman Practice and complained to Clayman Senior that her breasts were uneven, and that the right breast was smaller than the left. After performing a brief physical examination, Clayman Senior told her she had a deflation at her right breast implant, and that she needed surgery to replace both implants. That same date, Clayman Senior and/or Clayman Practice staff gave Ms. Long a written surgical estimate that said "Right smaller," that she needed to "Replace Both" at no charge to her.

59.    On May 12, 2014, Ms. Long presented to the Clayman Practice for her fifth breast surgery with Clayman Senior. In the surgical intake forms, Ms. Long wrote that she wanted her breasts to be "bigger" and "higher." Upon arriving, Clayman Senior and/or Clayman Practice staff had Ms. Long sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she had a "Right deflation," and that she needed a "Bilateral Replace." A preoperative photograph taken of her breasts that date demonstrates that she did not have a rupture, deflation, or leak at either of her breasts.

60.    In the Operative Report and OR Record (both of which were dated May 12, 2014), Clayman Senior documented that her preoperative diagnosis was "Right deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the right, the implant was "found to have approximately 50% deflation with (tissue/leak @ valve) and removed." The left implant was found intact, but it was also removed. Both implants were replaced with Allergan Natrelle Style 68 Medium Profile 650cc saline implants. Once again, Clayman Senior failed to document the amount of saline he used to inflate the implants.

61.    On or between May 12, 2014, and May 14, 2014, Clayman Senior and/or Clayman Practice staff had Ms. Long sign an Allergan breast implant warranty claim form that stated she had a spontaneous rupture, deflation, or leak at her right implant, and that as a result, she was required to undergo surgery to remove and replace both implants.  The Claymans sent the removed implants and the completed warranty claim forms to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory.  After conducting an analysis of the implant, the Device Analysis Laboratory found no basis for the claimed rupture, deflation, or leak.  Specifically, the Laboratory found "no openings in the implant" and that "valve functioning was satisfactory."  Nevertheless, on July 31, 2014, the Clayman Practice received a warranty claim check from Allergan for $1,200 for the removed implants.

62.    After having her sutures from the May 12, 2014 surgery removed, Ms. Long did not return to the Clayman Practice.

63.    On July 10, 2017, Ms. Long presented to a different plastic surgeon for an evaluation of her breasts.  After performing an extensive physical examination, the other plastic surgeon noted that she had very large, overfilled saline breast implants with significant size and shape asymmetry.  The other surgeon recommended two additional breast surgeries.  The first surgery would involve having her implants removed a bilateral mastopexy performed.  Then, at least three months later, the second surgery would involve placing new implants that were appropriately sized for her chest.

## COUNT I – ALLERGAN AND MOJICA AIDING AND ABETTING

## THE CLAYMANS' BREACH OF FIDUCIARY DUTY AND/OR FRAUD

64.    Ms. Long re-alleges and incorporates by reference paragraphs 1 through 63.

65.    Throughout the care and treatment of Ms. Long, the Claymans breached their fiduciary duty owed to her by:

(a).    Claiming that one of her breast implants had ruptured, deflated, or leaked when it had not.

(b).    Performing revision surgeries on July 31, 2013; December 2, 2013; February 10, 2014; and May 12, 2014, based upon alleged spontaneous implant ruptures, deflations, or leaks that did not exist, which placed her at increased risk for surgical and anesthetic complications, and which involved simply repeating the same procedure that was previously performed.

(c).    Not performing the surgery that her physical condition actually required, in favor of surgery that took less time and skill, to allow for the removal and replacement of saline implants under Allergan's Warranty.

66.    On one or more of the below occasions, the Claymans made the following false statements or representations, which were intended to conceal their financial and other personal motivations in connection with the removal and replacement of allegedly ruptured, deflated, or leaking Allergan Natrelle saline implants, and which in fact misled Ms. Long and/or others, and/or caused her to respond in the following ways to her detriment:

(a).    On July 15, 2013, Clayman Senior told Ms. Long that she had a left deflation and that she needed surgery to remove and replace both implants.  In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.  This representation caused Ms. Long to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior and/or the Clayman Practice; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Long did not

seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(b).    In the Operative Report and OR Record (both of which were dated July 31, 2013), Clayman Senior represented to Ms. Long and others that her preoperative diagnosis was "Left deflation."  Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the left, the implant was "found to have a deflation (tissue/leak @ valve) and removed."  In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems she was having with her breasts.  These representations caused Ms. Long and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(c).    On or between July 31, 2013, and August 7, 2013, the Claymans made a warranty claim to Allergan regarding the left breast implant removed on July 31, 2013. Specifically, the Claymans had Ms. Long sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her left breast implant, for which she needed a removal and replacement procedure for both implants.  By having Ms. Long sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced.  In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast

implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Long and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(d).    On November 13, 2013, Clayman Senior told Ms. Long that she had a left deflation and that she needed surgery to remove and replace the left implant. In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts. This representation caused Ms. Long to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior and/or the Clayman Practice; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(e).    In the Operative Report and OR Record (both of which were dated December 2, 2013), Clayman Senior represented to Ms. Long and others that her preoperative diagnosis was "Left deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the left, the implant was "found to have deflation (tissue/leak @ valve) and removed." In fact, Ms.

Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems she was having with her breasts.  These representations caused Ms. Long and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(f).     On or about December 2, 2013, the Claymans made a warranty claim to Allergan regarding the left breast implant removed on December 2, 2013.  Specifically, the Claymans had Ms. Long sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her left breast implant, for which she needed a removal and replacement procedure for the implant.  By having Ms. Long sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced.  In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Long and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(g).    On February 5, 2014, Clayman Senior told Ms. Long that she had a left deflation and that she needed surgery to remove and replace both implants.  In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.  This representation caused Ms. Long to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior and/or the Clayman Practice; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(h).    In the Operative Report and OR Record (both of which were dated February 10, 2014), Clayman Senior represented to Ms. Long and others that her preoperative diagnosis was "Left deflation."  Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the left, the implant was "found to have a deflation (tissue/leak @ valve) and removed."  In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems she was having with her breasts.  These representations caused Ms. Long and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Long did not seek a

second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(i).    On or between February 10, 2014, and February 12, 2014, the Claymans made a warranty claim to Allergan regarding the left breast implant removed on February 10, 2014.   Specifically, the Claymans had Ms. Long sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her left breast implant, for which she needed a removal and replacement procedure for both implants.   By having Ms. Long sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced.   In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts.   These representations caused Ms. Long and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.   As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(j).    On April 14, 2014, Clayman Senior told Ms. Long that she had a right deflation and that she needed surgery to remove and replace both implants.   In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.   This representation caused Ms. Long to conclude that the problems she was experiencing with her breasts were the result of a defective breast

implant rather than the medical negligence of Clayman Senior and/or the Clayman Practice; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(k).   On May 12, 2014, Clayman Senior and/or Clayman Practice staff had Ms. Long sign an "Authorization for and Consent to Surgery or Therapeutic Procedrures" that stated she had a "Right deflation," and that she needed a "Bilateral Replace." In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts. This representation caused Ms. Long to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior and/or the Clayman Practice; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(l).   In the Operative Report and OR Record (both of which were dated May 12, 2014), Clayman Senior represented to Ms. Long and others that her preoperative diagnosis was "Right deflation." Clayman Senior further documented in the Operative Report that upon dissecting down to the implant capsule on the right, the implant was "found to have approximately 50% deflation with (tissue/leak @ valve) and removed." In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the

problems she was having with her breasts.  These representations caused Ms. Long and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another breast surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(m).    On or between May 12, 2014, and May 14, 2014, the Claymans made a warranty claim to Allergan regarding the right breast implant removed on May 12, 2014. Specifically, the Claymans had Ms. Long sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her right breast implant, for which she needed a removal and replacement procedure for both implants.  By having Ms. Long sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced.  In fact, Ms. Long did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Long and others to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Long did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

67.    For the reasons previously stated in paragraphs 30 through 39 above, Allergan and Mojica knew that the Claymans were breaching a fiduciary duty owed to Ms. Long, and/or committing fraud upon her.  Despite this knowledge, Allergan and Mojica provided substantial assistance to the Claymans in committing fraud against Ms. Long, and/or breaching a fiduciary duty owed to her, in one or more of the following ways:

(a).    Continuing to sell saline breast implants to the Claymans while Ms. Long was a patient of the Claymans; and

(b).    Ensuring and making payment of the warranty claims of the Claymans in relation to the saline implants that Clayman Senior surgically removed from Ms. Long on July 31, 2013; December 2, 2013; February 10, 2014; and May 12, 2014.

68.    As a direct and proximate result of the substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Long suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

69.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Long has spent monies in the amount of $3,750 or more, for medical and/or surgical care by the Claymans that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **MELONIE D. LONG**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by

jury on all issues so triable.

## COUNT II – ALLERGAN, MOJICA, AND THE CLAYMANS' CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY AND/OR FRAUD

70.     Ms. Long re-alleges and incorporates by reference paragraphs 1 through 63, 65, and 66.

71.     On or before May 22, 2012, Allergan, Mojica, and the Claymans entered into an agreement to commit one or more breaches of a fiduciary duty and/or fraud in relation to the Claymans' patients.  The acts and conduct illustrative of the parties' intent to enter into this agreement are alleged in paragraphs 30 through 39 above.  Furthermore, Mojica had a personal stake in the activities of the conspiracy that was separate from Allergan's interests in the conspiracy, i.e. his personal advancement within the company and individual incentive pay and/or commissions.

72.     Allergan and Mojica committed one or more of the following overt acts in furtherance of the conspiracy to breach a fiduciary duty and/to commit fraud:

(a).    Continuing to sell saline breast implants to the Claymans while Ms. Long was a patient of the Claymans; and

(b).    Ensuring and making payment of the warranty claim of the Claymans in relation to the saline implants that Clayman Senior surgically removed from Ms. Long on July 31, 2013; December 2, 2013; February 10, 2014; and May 12, 2014.

73.     As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty, Ms. Long suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care

and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

74.     Furthermore, as a direct and proximate result of the above noted conspiracy to breach a fiduciary duty and/or to commit fraud, Ms. Long has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **MELONIE D. LONG**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – FLORIDA CIVIL RICO AND REMEDIES
## FOR CRIMINAL ACTIVITIES – CONSPIRACY

75.     Ms. Long re-alleges and incorporates by reference paragraphs 1 through 63, 65, 66, 71 and 72.

76.     Allergan and Mojica violated sections 772.103(4) and 895.04(4), *Florida Statutes*, by conspiring with the Claymans to violate sections 772.103(3) and 895.03(3), respectively.

77.     In connection with the fraudulent scheme, Allergan, Mojica, and the Claymans agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity.

78.     Allergan, Mojica, and the Claymans agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two acts of criminal and racketeering activity.

79. The predicate acts of Allergan, Mojica, and/or the Claymans began at an unknown date, and involved hundreds of the Claymans' breast implant patients.

80. The predicate acts of Allergan, Mojica, and/or the Claymans continued to occur against the Claymans' breast implant patients at least until October 26, 2017.

81. As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Long suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

82. Furthermore, as a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Long has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

83. Despite her diligence and efforts, Ms. Long's discovery of these ongoing injuries was delayed by Allergan, Mojica, and/or the Claymans' fraudulent concealment activity.

84. As a result of the foregoing, Ms. Long has had to hire the undersigned attorney and his law firm, and has agreed to pay him/them a reasonable fee for his/their services.

85. Pursuant to Section 772.104, *Florida Statutes*, Ms. Long is entitled to recover treble damages plus costs and attorney's fees from Allergan and Mojica.

WHEREFORE, the Plaintiff, **MELONIE D. LONG**, pursuant to Section 895.05, *Florida Statutes*, demands judgment for treble actual and consequential damages arising from the conduct of the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, an award

of costs and all reasonable attorneys' fees, and the following additional remedies:

A.    A preliminary injunction prohibiting similar conduct by the Defendants in the State of Florida;

B.    A permanent injunction prohibiting similar conduct by the Defendants in the State of Florida;

C.    Revocation of the certificate authorizing the Defendant, **ALLERGAN SALES, LLC**, to do business in the State of Florida;

D.    Forfeiture of all monies and real and personal property received or obtained by the Defendants as a result of the acts alleged in this Count, and the Plaintiff, **MELONIE D. LONG**, will have a claim for any and all such forfeited monies and real and personal property;

E.    A civil penalty against the Defendant, **RICARDO E. MOJICA**, in the amount of $100,000;

F.    A civil penalty against the Defendant, **ALLERGAN SALES, LLC,** in the amount of $1,000,000; and

G.    Any further relief the Court deems just and proper.

Dated this 29th day of May, 2020.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:    (904) 632-2424
Facsimile:    (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiff